## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FAS LEBBIE & SABRINA FESSLER )
)
          Plaintiffs, )    2:22-CV-1062
)
      v. )
)
LFL SHADY, L.P., )
)
)
          Defendant. )

### <u>OPINION</u>

**J. Nicholas Ranjan, United States District Judge**

Plaintiffs Fas Lebbie and Sabrina Fessler needed housing fast.[1]  They had just returned from an extended trip to Sierra Leone for Mr. Lebbie's student research and were moving to Pittsburgh for Mr. Lebbie to begin a graduate-school program.  ECF 44-1, p. 83 (Ex. D (Lebbie Depo. Tr.) at 47:15-48:9); ECF 53-5, ¶¶ 5, 7.  Plaintiffs viewed an online listing for available units at Shadyside Commons, an apartment building owned by Defendant LFL Shady, L.P.  ECF 53-5, ¶¶ 5-6, 10.  When they arrived in Pittsburgh on June 4, 2021, they visited the unit at Shadyside Commons in person for the first time, and decided to sign a lease.  *Id.* ¶ 10.

LFL Shady's lease is a form lease and imposes few, if any, contractual obligations on landlords while disclaiming their liability in nearly all instances.  *See id.* ¶ 2; ECF 44-1 (Ex. A).  Even so, Plaintiffs read and signed the lease to rent Apartment Unit 229 at Shadyside Commons for one year.  ECF 53-5, ¶¶ 4, 8.

Kaitlyn Zanicky, LFL Shady's leasing consultant, then gave Plaintiffs a tour of Shadyside Commons, including the building's separate storage rooms for tenants' exclusive use.  *Id.* ¶ 10.  Per LFL Shady's "unwritten policy," to obtain a storage unit, tenants must inform LFL Shady personnel which storage unit they intend to use

---

[1] Since the dispute now arises before the Court on Defendant's motion for summary judgment, the facts here are construed in the light most favorable to Plaintiffs.

either orally or by email and obtain their own lock for that unit; then, LFL Shady personnel note which tenants are using which storage units in an Excel spreadsheet. ECF 44-1, p. 126 (Ex. E (Brown Depo. Tr.) at 27:4-25).  Plaintiffs say they informed Ms. Zanicky of their choice of storage unit while she was giving them the tour of the building; LFL Shady says Plaintiffs didn't do so at that point or any time afterward. ECF 45, p. 9; ECF 53-5, ¶¶ 16-28; ECF 54, pp. 3-5.  Plaintiffs also never received documentation establishing or otherwise reflecting LFL Shady's storage room policy. *E.g.*, ECF 44-1 (Ex. A); *id.* at 64 (Ex. C (Zanicky Depo. Tr.) at 18:2-19:6).

Plaintiffs began placing their items in storage unit C7—the one they told Ms. Zanicky they would use—and eventually placed a lock on the door.  ECF 44-1, p. 41 (Ex. B (Fessler Depo. Tr.) at 27:23-29:5); ECF 53-5, ¶ 29.  Among the items they stored was a "Kimberley Certificate," which is a document issued by the government of Sierra Leone that attests to the value of ethically sourced diamonds mined by Mr. Lebbie's business, Root Diamonds LLC.  ECF 44-1, pp. 103 (Ex. D (Lebbie Depo. Tr.) at 128:5-11), 109-110 (Ex. D at 149:22-150:18).  The certificate is valued at over $40,000.  *Id.*

Sometime between June 4 and June 14, 2021, Kathleen Brown, the property manager, noticed that storage unit C7 had bags in it but did not have a lock on the door at that time.  ECF 53-5, ¶ 30.  The spreadsheet that tracked which tenants were using which storage units also did not reflect that Plaintiffs had checked out a storage unit.  ECF 44-1, p. 68 (Ex. C (Zanicky Depo. Tr.) at 36:11-20).  Ms. Brown therefore instructed a maintenance worker, Zdravko Bakovic, to clear storage unit C7.  *Id.* at 148-49 (Ex. H), 154-55 (Ex. I (Bakovic Depo. Tr.) at 13:15-14:3).  When Mr. Bakovich went to the storage unit, the unit had a lock on the door, so he cut it, went inside the unit, and observed several suitcases and bags.  *Id.* at 154-55 (Ex. I (Bakovic Depo. Tr.) at 12:14-15:3).  He called Ms. Brown and told her that there were items in the

unit, and she instructed him to "throw [them] away." *Id.* at 155 (Ex. I (Bakovic Depo. Tr.) at 15:1-9). Mr. Bakovic complied, but saved a box containing an iPhone and some smaller items. *Id.* (Ex. I (Bakovic Depo. Tr.) at 15:15-17:16).

On June 17, 2021, Plaintiffs went to the storage unit and saw that their lock had been cut and a new lock had been placed on the door. *Id.* at 42-43 (Ex. B (Fessler Depo. Tr.) at 32:3-33:9, 35:24-36:7); ECF 53-5, ¶ 37. Fearing theft, they called the police and filed a report. ECF 44-1, p. 89 (Ex. D (Lebbie Depo. Tr.) at 71:25-73:2). They also called Mr. Bakovic, who admitted to cutting their lock and disposing of their property. *Id.* at 43-44 (Ex. B (Fessler Depo. Tr.) at 34:5-38:17). Plaintiffs recovered the few items that Mr. Bakovic had saved, but nothing else. ECF 53-5, ¶ 40.

Plaintiffs continued to live at Shadyside Commons until April 29, 2022, vacating before the lease terminated. *Id.* ¶ 41. During that time, they didn't use storage unit C7 (or any other storage unit) because LFL Shady's lock had been placed on the door, and they "did not feel safe anymore" or trust that their items would be protected in LFL Shady's storage units. ECF 44-1, pp. 47 (Ex. B (Fessler Dep. Tr.) at 50:7-53:18), 91 (Ex. D (Lebbie Depo. Tr.) at 78:14-79:15).

Plaintiffs blamed LPL Shady for disposing of their property and filed this action on July 26, 2022, alleging conversion, negligence, breach of contract, violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, trespass,

breach of the implied warranty of habitability, breach of the covenant of quiet enjoyment, and intentional infliction of emotional distress.  ECF 1.

This Court dismissed the claims for negligence, violation of the UTPCPL, and trespass under the gist-of-the-action doctrine, and the IIED claim for failure to state a claim.  ECF 24.

LFL Shady now moves for summary judgment on the remaining claims of the complaint (Counts I, III, VI, and VII) and to strike Plaintiffs' requested relief for punitive damages, certain compensatory damages, attorneys' fees, and demand for a jury trial.  ECF 44.  Plaintiffs oppose the motion.  ECF 54.

Applying the familiar standard of Federal Rule of Civil Procedure 56,[2] the Court will deny LFL Shady's motion on the claims for conversion, breach of contract, and breach of the covenant of quiet enjoyment, but will grant the motion as to the claim for breach of the implied warranty of habitability.  The Court will also deny LFL Shady's motion to strike Plaintiffs' requested relief.

## DISCUSSION & ANALYSIS

### I.    The storage unit is within the lease's definition of an "apartment."

Before turning to the specifics of LFL Shady's motion, the Court must resolve a threshold question—whether the parties' lease contemplated that the subject of the

---

[2] Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility."  *Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up).  The moving party bears the initial burden to show the lack of a genuine dispute of material fact, and "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper.  *Id.* (cleaned up).

lease, the "apartment," included a storage unit for Plaintiffs' exclusive use.  This is an important question because Plaintiffs' claims at summary judgment stand or fall in large part on whether they had possessory rights in the storage unit.  After careful review of the lease language, the Court concludes that the lease's definition of "apartment" includes the separate storage unit.

"It is well-established that the interpretation of a lease is a question of law and this Court's scope of review is plenary." *Hand v. Fuller*, 294 A.3d 468, 472 (Pa. Super. Ct. 2023) (cleaned up).  Applying ordinary contract principles, the Court must "ascertain and give effect to the intent of the contracting parties, recognizing that the intent of the parties to a written contract is contained in the writing itself." *Id.* (cleaned up).  Further, "[i]f doubt arises out of the uncertainty as to the meaning of the language used in a lease, its provisions will be construed most strongly against the lessor and in favor of the lessee." *Nw. Sav. Bank & Fin. Servs. v. NS First St. LLC*, 802 F. Supp. 2d 580, 587 (M.D. Pa. 2011) (cleaned up).

LFL Shady argues that the lease and the possessory rights it granted only covered the actual apartment unit under section 1, which states, "You've agreed to rent Apartment No. 482-0229 at 401 Amberson Avenue (street address) in Pittsburgh (city), Pennsylvania, 15232 (zipcode) (the 'apartment' or the 'premises') for use as a private residence only."  ECF 44-1 (Ex. A), p. 10; ECF 45, pp. 9 ("Plaintiffs have no possessory right to a storage unit under the Lease"), 12-13; ECF 56, p. 2 n.1.  And since the storage unit was in a separate area of the facility, LFL Shady maintains

that it cannot be included within the definition of "apartment," and so all of Plaintiffs'
claims based on the lease fail.  The Court, however, disagrees.

The Court is not limited only to section 1 of the lease.  When read as a whole,
the lease's other provisions reflect the parties' intent that a storeroom or storage area
for Plaintiffs' exclusive use falls within the definition of the "apartment."

For example, section 14, entitled "Property Left in Apartment," states,
"'Apartment' excludes common areas but includes interior living areas and exterior
patios, balconies, attached garages, and storerooms for your exclusive use."  ECF 44-
1 (Ex. A), p. 10.[3]  And section 49, entitled "Cleaning," requires tenants to "thoroughly
clean the apartment, including doors, windows, furniture, bathrooms, kitchen
appliances, patios, balconies, garages, carports, and ***storage rooms***."  *Id.* at 16
(emphasis added).  These sections thus show the parties' intent that a reserved
storage room is included in the leased "apartment."[4]

Now that the Court has determined that the lease extended to a checked-out
storage unit, the second question is whether Plaintiffs, in fact, checked out storage
unit C7 by advising LFL Shady.  Unlike the first issue, this second issue is a question
of fact over which a genuine dispute exists.  ECF 45, p. 9; ECF 54, pp. 3-5.  Since this
is summary judgment, the Court must view the evidence in the light most favorable

---

[3] LFL Shady contends that the "isolated definition" of "Apartment" as used in section
14 is meant only "to define the whereabouts of . . . abandoned property on the
premises" and is limited to that section only.  ECF 45, p. 13.  But nothing in section
14 of the lease states that its definition of "Apartment" is limited to that section only.
*Delaware Cnty. v. Delaware Cnty. Prison Emps. Indep. Union*, 713 A.2d 1135, 1137
(Pa. 1998) ("[T]he focus of interpretation is upon the terms of the agreement as
manifestly expressed, rather than as, perhaps, silently intended." (cleaned up)).  If
anything, that section reflects the parties' intent that the lease as a whole includes
the storage areas.

[4] To be clear, what's sauce for the goose is sauce for the gander.  So, for example, if
Plaintiffs had destroyed the storage unit assigned to them, LFL Shady could have
invoked the terms of the lease to sue for a breach.

to Plaintiffs and draw all reasonable inferences in their favor without weighing credibility. Plaintiffs have presented evidence in the form of affidavits and deposition testimony that supports their position. *See, e.g.*, ECF 44-1, pp. 40-41 (Ex. B (Fessler Depo. Tr.) at 25:3-27:25); ECF 53-1, p. 3; ECF 53-2, pp. 1-2. So, at this stage, the Court concludes that Plaintiffs notified LFL Shady of their use of storage unit C7, and is guided by that conclusion in addressing LFL Shady's motion.

## II.   Plaintiffs have established a triable claim for conversion.

"Under Pennsylvania law, a conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." *Win & Son, Inc. v. City of Phila.*, 178 F. Supp. 3d 234, 242 (E.D. Pa. 2016) (cleaned up). "A conversion can be committed in several ways, including . . . seriously damaging or misusing the chattel in defiance of the owner's rights." *Id.* at 242-43 (cleaned up).

Plaintiffs have presented a triable claim for conversion (Count I) when the evidence is viewed in the light most favorable to them—that is, that LFL Shady knew that Plaintiffs were storing their items in storage unit C7. Specifically, LFL Shady deprived Plaintiffs of their use or possession of the stored property without Plaintiffs' consent when Mr. Bakovic threw the items in the garbage at Ms. Brown's direction, and LFL Shady had no lawful justification for removing that property.[5] *Cf. In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. 808, 814 (Bankr. E.D. Pa.) (creditor-landlord's

---

[5] If LFL Shady did not know that Plaintiffs were using the storage unit, it may be able to justify removing the property if it believed the property was abandoned. *See* 68 P.S. § 250.505a(b) (governing landlord's disposal of abandoned property); *see also* ECF 44-1, p.11 (Ex. A, § 14) (incorporating section 250.505a(b) into lease). But at summary judgment, the Court must view the evidence in the light most favorable to Plaintiffs as the non-moving party.

disposal of tenant's property one day after lease was terminated "constituted a conversion"), *aff'd in part and remanded*, 108 B.R. 482 (E.D. Pa. 1989).

LFL Shady doesn't dispute the claim on the merits, and instead argues that the claim must be dismissed under exculpatory language in the lease.  ECF 45, pp. 10, 12.  First, it points to section 9, entitled "Insurance," which states, "[LFL Shady is] not responsible to any resident, guest, or occupant for damage or loss of personal property or personal injury from (including but not limited to) [various weather events,] . . . theft . . . negligence of other residents, occupants, or invited/uninvited guests or vandalism unless otherwise required by law."  ECF 44-1 at 11 (Ex. A, ¶ 9)).

Section 9, however, doesn't apply here.  Section 9 disclaims LFL Shady's liability for weather events and *other people's* acts; based on the plain language of the lease and public policy, the provision does not allow LFL Shady to disclaim liability for its own intentional or reckless behavior.  *See Tayar v. Camelback Ski Corp.*, 47 A.3d 1190, 1200, 1203 (Pa. 2012) (holding that contract "releases for intentional tortious conduct" and "exculpatory releases of reckless behavior" are prohibited as a matter of public policy); Restatement (Second) of Contracts § 195(1) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy.").  So the liability waiver in section 9 is toothless against Plaintiffs' claim for conversion.

Second, LFL Shady invokes section 27, a subsection of which is entitled "Casualty Loss" and which states, "We're not liable to any resident, guest, or occupant for personal injury or damage or loss of personal property from any cause, including but not limited to . . . theft, or vandalism unless otherwise required by law."  ECF 44-1, p. 13 (Ex. A, § 27).  Though this provision refers to criminal conduct, LFL Shady

argues that Plaintiffs' conversion claim is really one for "civil theft," so it falls under the disclaimer in section 27.  ECF 45, pp. 11-12.

But this argument too fails because, under Pennsylvania law, "'theft' refers to criminal conduct governed by statutory law[,]" not the private intentional tort of conversion.  *Sterling v. Redevelopment Auth. of City of Phila.*, 836 F. Supp. 2d 251, 270 (E.D. Pa. 2011) (quoting *Waye v. First Citizen's Nat'l Bank*, 846 F. Supp. 310, 320 (M.D. Pa. 1994)), *aff'd*, 511 F. App'x 225 (3d Cir. 2013).  LFL Shady cites *Waye* for support, but that case only supports the Court's conclusion.  *Waye*, 846 F. Supp. at 320 (construing private action for "theft" as one for conversion since "there is no statutory or common law cause of action for theft[,]" but dismissing for failure to state a claim).  In any event, it would be against public policy for LFL Shady to commit a theft and then disclaim liability for its unlawful act.[6]

Accordingly, the Court will deny LFL Shady's motion as to the conversion claim in Count I of the complaint.

## III.  Plaintiffs have established a triable claim for breach of the covenant of quiet enjoyment.

LFL Shady argues that Plaintiffs' claims for breach of contract (Count III) and breach of the covenant of quiet enjoyment (Count VII) must be dismissed because LFL Shady did not in fact breach any terms of the lease.  ECF 44, pp. 9, 13.  Even if there are no express lease terms at issue, the Court finds that Plaintiffs have

---

[6] Plaintiffs invoke 42 Pa. C.S.A. § 8310(a) (Damages in actions on thefts of leased property) in support of their conversion claim, but that statute doesn't apply here.  It refers to actions where a person "obtains personal property under an agreement for the lease or rental" of property and "intentionally deals with the property as his own."  18 Pa. C.S.A. § 3932(a).  In other words, it would apply if LFL Shady had leased from Plaintiffs their personal property, and had then stolen or destroyed the property.  That obviously didn't occur here.

presented a triable claim that LFL Shady breached the implied contractual covenant of quiet enjoyment.

"In Pennsylvania, every lease contains an implied covenant of quiet enjoyment." *1352 Lofts Prop. Corp. v. Bobby Chez of PA, LLC*, 855 F. Supp. 2d 367, 376 (E.D. Pa. 2012). Since the lease between Plaintiffs and LFL Shady contained an implied covenant of quiet enjoyment, a breach of that covenant effectively sounds in breach of contract. *See Grodin v. Farr*, No. 45 WDA 2019, 2020 WL 919200, at *6 (Pa. Super. Ct. Feb. 26, 2020) (finding independent breach of contract claim moot where landlord breached covenant of quiet enjoyment and constructively evicted tenants). And the Court concludes that, viewing the evidence in the light most favorable to Plaintiffs, there is a genuine dispute over whether LFL Shady breached that covenant and evicted Plaintiffs from part of the property.

A breach of the covenant of quiet enjoyment occurs when the landlord commits a "wrongful act . . . which results in an interference of the tenant's possession, in whole or in part[.]" *Cmty. Preschool & Nursery of E. Liberty, LLC v. Tri-State Realty, Inc.*, 717 F. Supp. 2d 482, 493 (W.D. Pa. 2010) (Schwab, J.), *aff'd*, 430 F. App'x 125 (3d Cir. 2011). "The impairment of the lessee's possession need not be total, but the utility of the premises must be substantially decreased by the landlord's interference with a right or privilege which is necessary to the enjoyment of the premises." *Grodin*, 2020 WL 919200, at *4 (cleaned up). A breach of the covenant of quiet enjoyment does not have to involve a structural change to property; it can be anything that substantially reduces the lessee's possession. *Kohl v. PNC Bank Nat. Ass'n*, 912 A.2d 237, 249-51 (Pa. 2006). A landlord's interference with a tenant's statutorily imposed right can be a breach. *Branish v. NHP Prop. Mgmt., Inc.*, 694 A.2d 1106,

1108 (Pa. Super. Ct. 1997) (landlord's preventing tenant from inviting social guests in violation of 68 P.S. § 250.504-A was breach of covenant of quiet enjoyment).

As noted above, the lease defines the "apartment" as including a properly checked-out storage unit for Plaintiffs' exclusive use, so Plaintiffs "possessed" storage unit C7.  And when LFL Shady disposed of Plaintiffs' property from the unit, it violated a right imposed by section 250.505a(f) of the Landlord and Tenant Act.  68 Pa. Stat. Ann. § 250.505a ("Under no circumstances may a landlord dispose of or otherwise exercise control over personal property remaining upon inhabited premises without the express permission of the tenant.").  That violation of Plaintiffs' right is enough to state a claim for breach of the covenant of quiet enjoyment.  *See Branish*, 694 A.2d at 1108.

An actual or constructive eviction from property can also be a breach of the covenant of quiet enjoyment.  A constructive eviction occurs when a landlord's interference with a tenant's possession or enjoyment of the possessed property is "of a substantial nature and so injurious to the tenant as to deprive him of the beneficial enjoyment of a part or the whole of the demised premises[.]" *Sears, Roebuck & Co. v. 69th St. Retail Mall, L.P.*, 126 A.3d 959, 968 (Pa. 2015) (cleaned up).  The constructive eviction only occurs once the tenant gives up possession because of the landlord's acts. *Id.*

Plaintiffs have presented evidence that they were evicted from that property. They testified at their depositions that they were physically prevented from accessing their storage room after the incident because LFL Shady placed their own lock on the unit.  ECF 44-1, pp. 47 (Ex. B (Fessler Depo. Tr.) at 51:2-53:16), 91 (Ex. D (Lebbie Depo. Tr.) at 78:14-79:15).  If a factfinder were to believe this, that would be an actual eviction.  Plaintiffs also testified that even if they were not physically prevented from accessing storage unit C7, they wouldn't have used it because they felt "unsafe"

- 11 -

storing their belongings there. *Id.* So not only were Plaintiffs physically deprived of access, but they also relinquished possession of their storage unit because of LFL Shady's acts. Thus, the Court finds that there is a genuine dispute over whether Plaintiffs were evicted from their storage unit following LFL Shady's interference with it.

LFL Shady argues that there was no constructive eviction because Plaintiffs resided in their apartment for the next 11 months and voluntarily chose to not use the same or another storage unit. ECF 45, pp. 16-17. But a constructive eviction need not be total, and interference with and abandonment of only part of the property can sustain a breach of the covenant of quiet enjoyment. *Kuriger v. Cramer*, 498 A.2d 1331, 1338 n.15 (Pa. Super. Ct. 1985) ("A court may also find that a tenant who remains in possession has been partially evicted if a landlord disturbs the tenant's possessory interest in only a part of the leased premises.").

It also doesn't matter for purposes of LFL Shady's motion that Plaintiffs could have requested to use storage unit C7 or another unit after the incident—they testified that they would not and could not trust LFL Shady to honor their possessory right, so they abandoned the storage unit. Whether LFL Shady's act was of a "level of substantiality and injuriousness necessary" to sustain a constructive eviction is a question for the factfinder to resolve, not the Court on summary judgment. *Sears, Roebuck & Co.*, 126 A.3d at 968.

In short, the Court finds there is a genuine dispute of material fact as to whether LFL Shady breached the lease's implied covenant of quiet enjoyment. Since

the nature of that breach sounds in contract, the Court will deny LFL Shady's motion for summary judgment on Counts III and VII of the complaint.[7]

## IV.   The Court will grant the motion as to breach of the implied warranty of habitability.

It's a different story for Plaintiffs' claim for breach of the implied warranty of habitability (Count VI).  The difference is: the covenant of quiet enjoyment addresses a right to possession, while the implied warranty of habitability concerns fitness for habitation—and Plaintiffs weren't inhabiting (*i.e.*, living in) the storage unit.

"The implied warranty [of habitability] is designed to insure that a landlord will provide facilities and services vital to the life, health, and safety of the tenant and to the use of the premises for residential purposes."  *Deaktor v. Sutton*, 245 A.3d 1070, 2020 WL 7353809, at *14 (Pa. Super. Ct. 2020) (cleaned up).  "In order to constitute a breach of the warranty[,] the defect must be of a nature and kind which will prevent the use of the dwelling for its intended purpose to provide premises fit for habitation by its dwellers.  At a minimum, this means the premises must be safe and sanitary of course[.]"  *Id.* (first alteration in original).

Plaintiffs argue that because the leased "apartment" included storage unit C7, the entire apartment was unfit as a dwelling because it was unsecure and unsafe.  ECF 54, p. 14 ("LFL Shady did nothing to repair or ensure that Plaintiffs would remain safe and free from Defendant's further actions of wrongfully removing their property.").  But an unsecure storage unit doesn't make a dwelling unfit for human habitation.  As Plaintiffs admit, the storage unit "is similar to a kitchen cabinet or a closet that are part of Plaintiffs' apartment."  *Id.*  Those facets of apartment living are not "vital to the life, health, and safety of the tenant and to the use of the premises

---

[7] The Court does find that these counts are largely duplicative, as Count III (breach of contract) essentially invokes the lease's implied duties.  So at trial, the jury will be instructed only on the claim for breach of the covenant of quiet enjoyment.

for residential purposes," as would front doors and windows with locks. *Pugh v. Holmes*, 405 A.2d 897, 905 (Pa. 1979). That Plaintiffs continued to reside at the apartment for 11 more months following the incident underscores how unessential storage is to the apartment's fitness as a dwelling. *Id.* at 902 (lease of a dwelling entails a "package of goods and services . . . which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.").

Accordingly, the Court will grant LFL Shady's motion on Count VI and dismiss Plaintiffs' claim for breach of the implied warranty of habitability.

## V.   The Court will deny LFL Shady's motion to strike Plaintiffs' requested relief.

LFL Shady also moves to strike Plaintiffs' request for punitive damages, compensatory damages, attorneys' fees, and demand for a jury trial. The Court will deny the motion to strike in its entirety.

### A.   Punitive damages.

"Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Snead v. Soc'y for Prevention of Cruelty to Animals of Pa.*, 929 A.2d 1169, 1184 (Pa. Super. Ct. 2007) (cleaned up), *aff'd*, 985 A.2d 909 (Pa. 2009). Punitive damages are appropriate when a defendant's conduct is so outrageous "as to demonstrate willful, wanton, or reckless conduct." *Id.* "'[R]eckless indifference to the rights of others and conscious action in deliberate disregard of them may provide the necessary state of mind to justify punitive damages." *Id.* (cleaned up).

LFL Shady argues that nothing in the record suggests that it or its agents acted with intent or malice in disposing of Plaintiffs' property. ECF 45, pp. 17-19. But that's a fact question that depends on the success of Plaintiffs' conversion claim.

- 14 -

*Weston v. Northampton Pers. Care, Inc.*, 62 A.3d 947, 961 (Pa. Super. Ct. 2013) ("The determination of whether a person's actions arise to outrageous conduct lies within the sound discretion of the fact-finder[.]"); *Francis J. Bernhardt, III, P.C. v. Needleman*, 705 A.2d 875, 879 (Pa. Super. Ct. 1997) ("Our finding on the conversion issue enables this court to award punitive damages."). So the Court will deny the motion.

### B. Compensatory damages.

LFL Shady asserts that Plaintiffs cannot recover compensatory damages for the loss of their items on two bases: first, that there is insufficient evidence in the record; and second, that the "business assets" owned by Mr. Lebbie's companies are not recoverable because those companies are not named plaintiffs. ECF 45, pp. 23-29. LFL Shady is incorrect on both accounts.

"[U]nder Pennsylvania law, damages need not be proved with mathematical certainty, but only with reasonable certainty, and evidence of damages may consist of probabilities and inferences." *AMCO Ins. Co. v. Emery & Assocs., Inc.*, 926 F. Supp. 2d 634, 647 (W.D. Pa. 2013) (Cercone, J.). "Damages for conversion and trespass to chattels may be based on the market value of property that is permanently converted, the diminution in market value as a result of a temporary conversion or trespass, or damages associated with the loss of use of personal property." *Sherwood v. Farber*, 266 A.3d 663, *6 (Pa. Super. Ct. 2021), *reargument denied* (Jan. 6, 2022). "In addition, a plaintiff who is tortiously deprived of property may recover the special value of the property to her if greater than the market value of the property." *Id.*

Contrary to LFL Shady's position, the record contains evidence of the value of Plaintiffs' lost items. *See* ECF 44-1 at 160-67 (Exhibit J); ECF 53-1, pp. 2-3. Plaintiffs appraised their personal items through receipts that they had kept and by looking up the market price of the same or similar item on the seller's website. ECF 44-1, p. 50

(Exhibit B (Fessler Depo. Tr.) at 61:13-64:11).  Mr. Lebbie also attested to the value of business assets, including the Kimberley Certificate.  *See, e.g.*, *id.* at 99-100 (Ex. D (Lebbie Depo. Tr.) at 110:12-117:2); ECF 53-1.  Additionally, outstanding expert discovery remains as to the value of some of these assets.  ECF 57.

As for LFL Shady's second argument, it doesn't matter (at least for Plaintiffs' conversion claim) that some of the property in the storage unit belonged to Mr. Lebbie's businesses.  Conversion refers to disruption of a party's right to possession of property at the time the property was converted.  *Serafini v. Mariani*, No. 08-469, 2010 WL 1342926, at *7 (M.D. Pa. Mar. 31, 2010).  That means that Plaintiffs didn't have to own the property in the storage unit—they merely needed to have had a right to possess it, for example, as an employee holding property for an employer.  Restatement (Second) of Torts § 895 (1979) ("[O]ne who is otherwise liable to another for harm to or interference with land or a chattel is not relieved of the liability because a third person has a legally protected interest in the land or chattel superior to that of the other."); *id.* Comment E.  The Restatement helpfully provides the following illustration:

> A delivers an automobile to B under a conditional sale agreement, by which A retains title to the car and B is to have possession only so long as he continues payments.  B defaults in his payments. Before A can repossess the car, C wrongfully takes it from B.  B brings an action against C for conversion.  C is subject to liability to B for the full value of the car and cannot set up as a defense A's title and right to possession.

*Id.* Illustration 3.

Since the evidence shows (and LFL Shady does not contest) that Plaintiffs rightfully possessed the property in the storage unit, including the Kimberley

Certificate that was an asset of Root Diamonds, they can seek the full value of the at-issue property from LFL Shady as damages flowing from the conversion claim.

### C.    Attorneys' fees.

LFL Shady moves to strike Plaintiffs' request for attorneys' fees.  But the Court finds that whether Plaintiffs are entitled to such an award, and if so, what the appropriate amount should be, is better addressed after trial and by way of a post-trial motion for attorneys' fees. *DHL Exp. (USA), Inc. v. Express Save Indus., Inc.*, No. 09-60276, 2009 WL 3242012, at *2 (S.D. Fla. Oct. 6, 2009) (denying motion to strike demand for attorneys' fees because such a motion "is best resolved in the context of a motion regarding the same filed at the conclusion of this action").

The Court will therefore deny the motion to strike the request for fees, but this denial is without prejudice to the parties briefing the attorneys' fees issue at the conclusion of the case.

### D.    Demand for jury trial.

LFL Shady moves to strike Plaintiffs' demand for a jury trial pursuant to a jury-trial waiver provision in the lease.  ECF 44-1 at 15 (Ex. A); *id.* at 17.  Despite that contractual provision, the Court will deny the motion.

"[T]he right to a jury trial in federal court, regardless of whether the claim arises under state law, presents a question of federal law." *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 662 (E.D. Pa. 2001).  A party can waive its right to a jury trial via contract, but such waivers are valid only if made knowingly and voluntarily.  *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 181 (W.D. Pa. 2020) (Colville, J.).  "A waiver is knowing and voluntary when the facts show that (1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was

conspicuous." *Id.* at 181-82 (citation omitted). Even so, "there is a presumption against waiver, [and] Courts do not uphold jury trial waivers lightly." *First Union Nat'l Bank*, 164 F. Supp. 2d at 663. The burden of proving a valid waiver is on the party seeking to enforce the waiver. *Id.*

The Court concludes that LFL Shady has not shown that Plaintiffs waived their right to a jury trial knowingly and voluntarily. The Court analyzes each factor in turn.

**Gross disparity in bargaining power**. LFL Shady did not draft the lease. Rather, it was drafted by the National Apartment Association as a "standard form agreement." ECF 45, p. 3 (cleaned up). As is evident from the terms of the lease, they are all either neutral or landlord-friendly. No term favors the tenant. A representative of LFL Shady testified that Plaintiffs could not alter any terms of the form lease. ECF 44-1, p. 122 (Ex. E (Brown. Depo. Tr.) at 13:9-13). Plaintiffs also signed the lease after a hasty move from New York to a city they had never been to. *Id.* at 40 (Ex. B (Fessler Depo. Tr.) at 22:1-5).

**Sophisticated business entities**. While Plaintiffs appear to be well-educated, they are individuals, and not corporate entities. This isn't the more common situation of a commercial tenant that waives its right to a jury trial. *See, e.g.*, *Boardakan Rest. LLC v. Atl. Pier Assocs., LLC*, No. 11-5676, 2014 WL 4058723, at *2 (E.D. Pa. Aug. 15, 2014) (upholding jury waiver provision where plaintiffs were

"sophisticated business entities" with "business savvy" and were represented by counsel).

**Opportunity to negotiate**.  As already stated, the lease was a pre-signed standard form agreement.  There was no opportunity to negotiate its terms.  ECF 44-1, p. 122 (Ex. E (Brown. Depo. Tr.) at 13:9-13).

**Conspicuous waiver**.  The jury-trial waiver provision appears twice in the lease; the first time, it appears under its own section, and the second time, it appears in "all caps" typeface on the signature page.  ECF 44-1, pp. 15, 17 (Ex. A).  A facial glance at the lease might suggest that the waiver was conspicuous, but it wasn't.

First, between the lease and addendums, the contract is over 30 pages long. The print of the lease is small (the Court estimates a font size of about 6 point or so); and the layout of the document makes it difficult to follow.  The jury-trial waiver provision also appears in the middle of the lease, and not at the signature page or on a separate page.

Second, and more importantly, the waiver language itself is, at best, unclear, and, at worst, intentionally misleading.  When jury-trial waivers have been upheld by courts, the language has a clear acknowledgment that the tenant is expressly giving up his or her right to a jury trial.  Consider the following waiver provisions that have been upheld:

- "THE BORROWERS HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE NOTES, THE LOAN DOCUMENTS OR THE TRANSACTIONS

CONTEMPLATED HEREIN OR THEREIN." *First Union Nat'l Bank*, 164 F. Supp. 2d at 664.

- "Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all rights it may have to trial by jury in respect of any proceedings arising out of or relating to this Agreement or any Transaction and acknowledges that it and the other party have been induced to enter into this Agreement by, among other things, these mutual waivers." *In re Castle Cheese, Inc.*, 541 B.R. 586, 598 (Bankr. W.D. Pa. 2015) (Deller, J.).

- "The Resident hereby waives Resident's right to demand a jury trial in any cause of action arising between Landlord and Resident concerning this contract." *Milsap v. Cornerstone Residential Mgmt., Inc.*, No. 05-60033, 2007 WL 965590, at *1 (S.D. Fla. Mar. 28, 2007).

- "It is mutually agreed by and between the Lessor and the Lessee that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaims brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this lease, the Lessee's use or occupancy of the apartment, or any claim of damage resulting from any act or omission of the parties in any way connected with this lease or the apartment." *Hines v. 1025 Fifth Ave., Inc.*, No. 14-3661, 2015 WL 765943, at *1 (S.D.N.Y. Feb. 23, 2015).

Now compare the language above to the jury-trial waiver language in the lease in this case, which provides:

> **41. WAIVER OF JURY TRIAL.** To minimize legal expenses and, to the extent allowed by law, you and we agree that a trial of any lawsuit based on statute common law, and/or related to this Lease Contract shall be to a judge and not a jury.

This waiver does not start by declaring that the parties waive their right to a jury. Instead, it starts by describing the benefit of saving on legal expenses, though it doesn't explain why or how that is accomplished. It says vaguely and without explanation that it applies as "allowed by law." It then buries the lede: the actual waiver of the right to a jury trial comes at the very end of the long sentence, and it simply reads, "not a jury" without mention of a right.

The lease mentions the jury-trial waiver later in a random "NOTICE" provision that is unnaturally tacked on to the bottom of a separate and long provision that deals with execution of the lease in counterparts. ECF 44-1, p. 17 (Ex. A). And in that NOTICE provision, the jury trial language itself appears only at the end of a long paragraph:

> **54. ORIGINALS AND ATTACHMENTS.** This Lease Contract has been executed in multiple originals, with original signatures. We will provide you with a copy of the Lease Contract. Your copy of the Lease Contract may be in paper format, in an electronic format at your request, or sent via e-mail if we have communicated by e-mail about this Lease. Our rules and community policies, if any, will be attached to the Lease Contract and provided to you at signing. When an Inventory and Condition form is completed, you should retain a copy, and we should retain a copy. Any addenda or amendments you sign as a part of executing this Lease Contract are binding and hereby incorporated into and made part of the Lease Contract between you and us. This lease is the entire agreement between you and us. You acknowledge that you are NOT relying on any oral representations. A copy or scan of this Lease Contract and related addenda, amendments, and agreements may be used for any purpose and shall be treated as an original.
>
> NOTICE: YOU ARE GIVING UP CERTAIN IMPORTANT RIGHTS. YOU ARE WAIVING YOUR RIGHT TO HAVE A NOTICE SENT TO YOU BEFORE WE START A COURT ACTION TO RECOVER POSSESSION OF THE APARTMENT FOR NONPAYMENT OR FOR ANY OTHER REASON. YOU ARE ALSO WAIVING YOUR RIGHT TO A JURY TRIAL.

The way this language appears—in different typeface, under an unrelated section, and without any headings of its own—is not conspicuous.

Considering the four relevant factors together, with particular weight on the language of the waiver and how inconspicuous it appears within the lease, and given the presumption against waiver, the Court will not enforce the jury-trial waiver.[8]

Accordingly, LFL Shady's motion to strike Plaintiffs' request for a jury trial will be denied.

## **CONCLUSION**

For the reasons above, the Court will grant LFL Shady's motion for summary judgment as to Count VI (breach of implied warranty of habitability) but will deny summary judgment as to the remaining counts. The Court will also deny LFL Shady's motion to strike Plaintiffs' requested relief. An appropriate order follows.

DATED this 20th day of December, 2023.

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge

---

[8] Plaintiffs also argue that the lease is a contract of adhesion. ECF 54, pp. 16-17. To sustain that position, they must show that the lease was both procedurally and substantively unconscionable. But Plaintiffs can't meet their burden because they can't show substantive unconscionability, that is, that the waiver provision unreasonably favors LFL Shady. *Bayne v. Smith*, 965 A.2d 265, 267 (Pa. Super. Ct. 2009). The jury-trial waiver on its face waives the right to a jury for both tenant and landlord, so that particular provision is neutral and does not favor LFL Shady.